**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| Plaintiff, | : | Case No. 2:07-cr-266 |
| v. | : | Judge Holschuh |
| LATOSHA MATHIS, | : | |
| Defendant. | : | |
| | : | |

**MEMORANDUM OPINION AND ORDER**

Defendant Latosha Mathis ("Defendant") is charged with carjacking, using a firearm while committing a crime of violence, and being a felon in possession of a firearm and ammunition. (Superseding Indictment, R. at 27.) This matter is currently before the Court on Defendant's Motion to Suppress Identification (R. at 19) and Motion to Suppress Physical Evidence (R. at 26). The Court held an evidentiary hearing on Defendant's Motion to Suppress Identification on February 29, 2008. For the reasons set forth below, both of Defendant's Motions are **DENIED**.

**I.    Background**

On the afternoon of December 7, 2007 Arturo Valencia ("Valencia"), a cable repair technician, was sitting in a company owned van parked near 3978 Karl Road in Columbus, OH. (Search Warrant Application Affidavit ¶ 2, Def. Mot. Suppress Physical Evidence ex. A., R. at 26 ("Search Warrant Affidavit").) An individual ("the Assailant") approached the van from the driver's side, pointed a gun at Valencia, and forced him into the passenger's seat while the Assailant entered the van. (Gov't. Response p. 2, R. at 32.) The Assailant then demanded money and other items from Valencia; Valencia turned over his wallet containing a small amount of money and a prepaid

credit card, a satellite radio receiver, a power inverter, and a silver, rectangular Sprint Trio cell phone.  (Search Warrant Affidavit ¶ 4.)  Unsatisfied with the amount of money, the Assailant demanded to know where Valencia lived, and began driving the van.  When Valencia told the Assailant that he had no money at his house, the Assailant fired a warning shot into the floorboard of the van and continued driving.  (Gov't. Response p. 2, R. at 32.)  The Assailant continued to drive the van, but when it stopped at a red light Valencia opened the passenger door and ran from the van. As he ran, the Assailant shot Valencia in the back, and then drove off.  (Id.)  The van was recovered a short distance away, in the parking lot of Clinton Middle School, 3940 Karl Road.  Valencia estimates that he was in the van with the Assailant for approximately 10 to 14 minutes. (Suppression Hr'g. Tr. p. 12, R. at 42.)

Valencia received first aid at a nearby convenience store, and was then transported to the hospital.  (Id.)  A robbery detective from the Columbus Police Department ("CPD") interviewed Valencia while he was hospitalized, and Valencia gave the officer a physical description of the Assailant.  Valencia described the Assailant as an African-American male, 18-22 years old, approximately 5' 7" tall, with a thin to medium build weighing between 140 and 150 lbs.  Valencia said that the Assailant had acne scarring on the cheeks, had short dark hair, was wearing a black hooded jacket and was carrying a small semiautomatic handgun.  (Id. p. 14.)  Valencia also stated that the Assailant had a "Kermit the Frog" look to the face.  (Id. p. 15.)

The next day, December 5, Detective Tim O'Donnell ("O'Donnell"), a detective with the CPD assigned to the FBI's Violent Crime Task Force (the "Task Force"), was assigned to Valencia's case.  (Id. p. 5, 11-12.)  O'Donnell and another detective, Jimmy Simmons ("Simmons") reinterviewed Valencia, who had been discharged from the hospital, for approximately one hour in

2

the early afternoon to get caught up with the investigation. (Id. p. 17-19.) Valencia gave O'Donnell and Simmons a physical description of the Assailant that substantially matched the initial description he gave in the hospital, the only difference being that Valencia expanded his estimate of the Assailant's weight to between 140 and 160 lbs. (Id. p. 20.) Valencia again stated that the Assailant's face had a "Kermit the Frog" look, but when O'Donnell asked him to elaborate, Valencia had trouble articulating what he meant and could only state that the shape of the Assailant's face, particularly the smallish mouth and an unusual separation between the eyes, reminded him of Kermit the Frog. (Id. p. 21.)

Based on Valencia's description and the results of interviewing witnesses to the carjacking and residents in the area, Simmons developed a "very loose" suspect on December 6. (Id. p. 23.) A store manager in the neighborhood where the carjacking occurred told Simmons that an individual named Trayon Kelley ("Kelley"), a resident of the area, had been causing problems in the neighborhood, and gave Simmons a physical description of Kelley that "vaguely fit" Valencia's description of the Assailant. (Id.) Based on this information, O'Donnell and Simmons decided to develop a photo array around Kelley to show Valencia.

The CPD uses a computer program called the Avatar Identi-View Computer System (the "Avatar System") to create photo arrays. When starting with a description of a known suspect or target individual, the officer constructing the array would enter the descriptive information, such as gender, race, weight, hair color and style, into the Avatar System. The Avatar System would then return a pool of photographs of individuals with similar characteristics. The officer would then choose which photographs to use in the photo array. CPD policy was to show a minimum of six photographs in any one array, although showing more photographs was acceptable.

3

Generally, gender and race are the most important factors to consider when constructing an array.  Hair color and style, as well as weight and the shape of an individual's face, are the next factors in importance, followed by scars and other distinctive markings on an individual's face. Height is not an important factor because all photos only show the individual's shoulders and head, and eye color is not an important factor because all photos are in black and white.  Although some factors, such as gender and race, are generally considered more important than others, O'Donnell was clear that all the factors together are important and relevant to creating a photo array of individuals with common characteristics that is framed around the target individual.  (<u>Id</u>. p. 6-11, 31.)

In this case, O'Donnell created the photo array that was framed around Kelley (the "Kelley array").  O'Donnell has created over 75 photo arrays during his twelve years as a detective with the CPD and with the Task Force, received on the job training from an experienced detective on how to properly create a photo array, and currently teaches new detectives how to prepare photo arrays at the CPD Academy.  (<u>Id.</u> p. 6-7; 56.)  O'Donnell began by searching the CPD files for a photo of and information on Kelley.  A photo of Kelley was on file, and the identification photo and accompanying description showed that Kelley was an African-American male, between 21 and 22 years old, 5' 11" tall, weighed 160 lbs. with a medium build, and had short black hair.  (<u>Id.</u> Def. ex. A.)  O'Donnell entered Kelley's gender, race, weight, and hair color and style into the Avatar System, and created a photo array of six individuals, one of whom was Kelley, based on the results. (<u>Id.</u>)

After creating this array, O'Donnell and Simmons called Valencia and informed him that they had developed a "loose" suspect, and wanted Valencia to look at a photo array.  Valencia

agreed, and O'Donnell and Simmons went to Valencia's home on the afternoon of December 6. (Id. p. 29-30.) O'Donnell prepared Valencia to view the Kelley array by stating that he was about to see photos, from the shoulders up and in black and white, of six individuals, arranged in two rows of three on one sheet of paper. (Id. p. 31.) O'Donnell also read from a standard CPD photo array procedure form which, in relevant part, read:

> The photo array you are about to view consists of six photographs in no particular order of importance. The subject of this investigation may or may not be included in the photographs. Look carefully at the photographs of all six people then advise the detective whether or not you recognize anyone. You are not required to select any of the photographs.

(Id. Def. ex. E.) Valencia then viewed the Kelley array for approximately two minutes, and conclusively stated that the Assailant was not present in the array. O'Donnell and Simmons then left. (Id. p. 33-34.)

The CPD and the Task Force had been investigating other leads, however, and by late afternoon on December 6, after O'Donnell and Simmons had shown Valencia the Kelley array, Defendant became a suspect in the investigation. (Id. p. 34-35.) After learning that Valencia's Sprint cell phone had been stolen during the carjacking, the Task Force contacted the Sprint/Nextel Corporation ("Sprint") on December 5. Through a process called "pinging" the phone, Sprint was able to provide the Task Force with the phone's GPS[1] coordinates. The accuracy of these coordinates depended on variables such as the weather and the nature of the phone's location, i.e., inside a structure or outdoors. (Search Warrant Affidavit ¶ 7.) Sprint pinged Valencia's phone at 5:40 p.m. on December 5, and 12:20 p.m. and 2:40 p.m. on December 6. Each time, Valencia's phone was located "in the vicinity" of the Stonegate Apartments, an apartment complex just south

---

[1] Global Positioning System.

of where the carjacking occurred and just north of where the van was recovered.  (Id. ¶¶ 6, 7.)

Additionally, Sprint informed the Task Force that three outgoing calls had been made from

Valencia's phone after it had been stolen.  Two of these calls were to an individual identified as a

Confidential Witness.  (Id. ¶ 5.)

Task Force agents interviewed the Confidential Witness on December 6, who stated that he

or she had been called by a person named "Tosha."  (Id. ¶ 6.)  The Confidential Witness gave a

physical description of "Tosha," and stated that she was a female who walked, talked, and dressed

like a male.  (Suppression Hr'g. Tr. p. 39-40.)  The Confidential Witness also stated that "Tosha"

worked at Emerson Network Power.  The Task Force agents contacted Emerson Network Power and

learned that "Tosha" was actually Defendant, who worked the third shift from 10:25 p.m. to 6:25

a.m. and who lived in the Stonegate Apartments, at 1515 Stonegate Square.  (Search Warrant

Affidavit ¶¶ 6, 8.)  The Task Force agents then contacted Sprint and requested that Sprint ping

Valencia's phone at 12:08 a.m. on December 7.  Sprint did so, and told the Task Force agents that

the phone was in the vicinity of Emerson Network Power.  (Id. ¶ 8.)

O'Donnell and Simmons were aware of these developments in the investigation, and by

December 7 Defendant was the primary target of the investigation.  There were, however, no

photographs of Defendant on file for O'Donnell to use to create a new photo array.  Further

investigation revealed that there were outstanding traffic warrants for Defendant's arrest, and the

Task Force decided to arrest Defendant on these warrants so that she could be photographed.

(Suppression Hr'g. Tr. p. 36-37.)  A special agent applied for a search warrant based upon the above

information and submitted a supporting affidavit on the morning of December 7, and the magistrate

judge issued the search warrant at 12:05 p.m.  (Def. Mot. Suppress Physical Evidence ex. A., R. at

26.)  The Defendant was arrested and the search warrant was executed approximately two hours later.  O'Donnell, Simmons, and the search warrant team entered Defendant's apartment and "rather rapidly" secured Defendant.  After completing some paperwork, Defendant was transported to CPD headquarters to be photographed.  (Suppression Hr'g. Tr. p. 41.)  On the way to CPD headquarters, O'Donnell and Simmons learned that Valencia's cell phone had been found in Defendant's apartment, as well as a credit card that appeared to belong to Valencia, a black hooded jacket, and a .22 caliber pistol.[2]  (Id. p. 42.)

Defendant was photographed, and the identification photograph and accompanying description showed that Defendant is an African-American female, 34 years old, 5' 5" tall, weighing 140 lbs. with a medium build and short black hair with acne scarring on her face.  (Id. Def. ex. F.) Due to Valencia's and the Confidential Witness' statements concerning Defendant's gender identification, however, O'Donnell also created an identification description that described Defendant as a male.  (Id. p. 39; Def. ex. F.)  Then, using the same Avatar System that he had previously used to create the Kelley array, O'Donnell created two six-person photo arrays around Defendant: one with female suspects, and one with male suspects.  (Id. Def. ex. B.) These two photo arrays were similar to the Kelley array that O'Donnell had previously shown Valencia: they were photos, from the shoulders up and in black and white, of six individuals, arranged in two rows of three on one sheet of paper.  Each photo array contained a photograph of Defendant.

O'Donnell then cut the two photo arrays into individual photographs, giving him twelve pictures.  He removed one of Defendant's photographs and then combined the photographs into a

---

[2] Further discovery and investigation has indicated that it appears that this pistol is not the pistol that was used during the carjacking.  (Gov't. Resp. to Def. Mot. for Bill of Particulars p. 1, R. at 34.)

stack of eleven individual photographs to create a photo array involving Defendant (the "stacked array"). Six of these photographs, including Defendant's photograph, were of females, while five were of males. (Id. p. 42-26, 60-61.) Rather than appearing on one piece of paper, as the Kelley array had, this eleven picture photo array consisted of eleven individual photographs on different pieces of paper. (Id. Gov't. ex. 1-11.) O'Donnell testified that showing eleven photographs instead of the minimum of six complied with CPD policies, as did showing the photographs individually in a stack, as opposed to together on one piece of paper. (Id. p. 48.) Further, O'Donnell testified that he conferred with other members of the Task Force, FBI agents, and an Assistant United States Attorney before deciding how to create and show the stacked array. (Id. p. 56.)

Once the stacked array was complete, O'Donnell and Simmons contacted Valencia at approximately 3:30 p.m. on December 7, informed him that they had developed another suspect, and that they wanted to show him more photographs. (Id. p. 46.) Valencia consented, and O'Donnell and Simmons went to Valencia's home. Once there, O'Donnell explained that the array would look different than the Kelley array had looked, and that it would include eleven photographs instead of six, but O'Donnell did not explain why these changes had been made. O'Donnell also again discussed the standard CPD photo array procedure form with Valencia, which stated that the subject of the investigation may or may not be in the photographs, and that Valencia was not required to select a photograph. (Id. Def. ex. E.) O'Donnell modified this standard form, however, by striking references to "six" photographs and interlineating "eleven," to reflect the fact that eleven photographs would be shown instead of six. (Id.) O'Donnell did not tell Valencia that the stacked array would contain photographs of females, and likewise did not tell Valencia that, earlier that day, the Task Force had found Valencia's cell phone in Defendant's apartment or that Defendant had

8

been arrested.  (Id. p. 46-47.)

Valencia took the stacked array and, while O'Donnell and Simmons sat quietly, he looked through all eleven photographs once or twice.  Valencia then began to slowly eliminate photographs. At one point he showed a photograph to O'Donnell and stated that it looked like a woman, but O'Donnell did not comment and "just shrugged [his] shoulders" as Valencia continued to look at and eliminate photographs.  (Id. p. 49-50.)  Valencia did not ask any other questions, and O'Donnell and Simmons did not otherwise interact with Valencia while he was looking at the stacked array.

After eight to ten minutes, Valencia had eliminated all but three photographs, and after approximately two more minutes Valencia identified Defendant as the Assailant.  (Id. p. 52; Gov't. ex. A6.)  Valencia signed a form stating: "I am fairly certain that the photograph that I identified [Defendant's photograph] is of the individual who robbed me."  (Id. Def. ex. E.)  Valencia could not further articulate what he meant by "fairly certain."  After Valencia made the identification and had signed statements to that effect, O'Donnell informed him that Defendant, the suspect he had identified, was a female, not a male.  Valencia was "very surprised" to hear this.  (Id. p. 57.)  Two days later, O'Donnell informed Valencia that his cell phone and credit card had been discovered inside Defendant's apartment, and at a later date Valencia viewed Defendant at a courtroom proceeding.  (Id. p. 56-57.)

Defendant was indicted on December 20, 2007, and a Superseding Indictment was returned on January 24, 2008.  (R. at 27.)  Defendant filed her Motion to Suppress Identification on January 7, 2008.  (R. at 19.)  Defendant then filed a Motion to Suppress Physical Evidence on January 16, 2008.  (R. at 26.)  The Government timely responded to Defendant's Motions, and the Court held an evidentiary hearing on Defendant's Motion to Suppress Identification on February 29, 2008.

Defendant filed a post-hearing brief on April 7, 2008 (R. at 43), and the Government responded on

April 11 (R. at 44).

## II.     Motion to Suppress Identification

Defendant's first Motion asks the Court to suppress evidence of Valencia's identification of

Defendant, because Defendant argues that the stacked array was unnecessarily suggestive and

violated her right to due process by increasing the likelihood of misidentification.  (Def. Mot.

Suppress Identification, R. at 19.)  The Government responds by arguing that the stacked array was

not unnecessarily suggestive.  (Gov't. Resp., R. at 44.)

### A.     Applicable Legal Standard

Pretrial identifications violate a defendant's due process rights and must be suppressed when

the procedure used to make the identification is so "impermissibly suggestive as to give rise to a

very substantial likelihood of . . . misidentification."  Simmons v. United States, 390 U.S. 377, 384

(1968); see also Neil v. Biggers, 409 U.S. 188, 198 (1972).  "It is the likelihood of misidentification

which violates a defendant's right to due process . . . .  Suggestive confrontations are disapproved

because they increase the likelihood of misidentification, and unnecessarily suggestive ones are

condemned for the further reason that the increased chance of misidentification is gratuitous."

Biggers, 409 U.S. at 198; see also Ledbetter v. Edwards, 35 F.3d 1062, 1070 (6th Cir. 1994).

When determining the admissibility of a pretrial identification, "reliability is the linchpin."

Manson v Brathwaite, 432 U.S. 98, 114 (1977).  Courts use a two-step analysis first articulated in

Biggers to assess the admissibility of a pretrial identification.  The first step in the Biggers test is to

determine whether the identification procedure used was unnecessarily suggestive.  Biggers, 409

U.S. at 198-99; Brathwaite, 432 U.S. at 107, Ledbetter, 35 F.3d at 1070-71.  The defendant bears

the burden of proving that the procedure was unnecessarily suggestive.  United States v. Hill, 967 F.2d 266, 230 (6th Cir. 1992).  If the court determines that the procedure was unnecessarily suggestive, the Court must then go on to the second step and determine if, under the totality of the circumstances, the identification is reliable despite the suggestive nature of the procedure.  A court need only address the reliability of the identification if the defendant meets the burden to show that the procedure was unnecessarily suggestive.

To determine whether an identification based on a photographic array was unnecessarily suggestive, courts generally look at the number of photographs shown to the witness, the nature of the photographs shown to the witness, and the police officer's conduct when presenting the photographs.  As the Supreme Court stated in Simmons, the risk of misidentification is

> increased if the police display to the witness only the picture of a single individual who generally resembles the person [the witness] saw, or if they show [the witness] the pictures of several persons among which the photograph of a single such individual recurs or is in some way emphasized.  The chance of misidentification is also heightened if the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime.

Simmons, 390 U.S. at 383 (internal footnotes omitted).  See also United States v. Stamper, 91 F.App'x 445, 459 (6th Cir. Mar. 3, 2004) ("We consider several factors, such as 'the size of the [photographic] array, the manner of its presentation by the officers, and the details of the photographs themselves'") (quoting United States v. Sanchez, 24 F.3d 1259 (10th Cir. 1994)).  These factors must be considered in relation to one another and in the context of the facts of the case before the court.  United States v. Tyler, 714 F.2d 664, 667-68 (6th Cir. 1983).

**B.    Analysis**

Defendant argues that "the cumulative [effect] of how the second array was prepared and presented rendered the identification procedure 'impermissibly suggestive.'" (Def. Post-Hr'g. Mem.

11

p. 8, R. at 43.) Defendant's main argument is that a combination of O'Donnell's conduct and the composition of the stacked array, when compared to the Kelley array, suggested to Valencia that the "prime target" of the investigation was in the stacked array, which made the stacked array unnecessarily suggestive.

Defendant first discusses O'Donnell's conduct when contacting Valencia. When O'Donnell contacted Valencia about viewing the Kelley array, O'Donnell told Valencia that he and Simmons had developed a "loose" suspect. In contrast, when he contacted Valencia about viewing the stacked array, O'Donnell stated that he had developed another suspect and did not describe the suspect as a "loose" one. (Suppression Hr'g. Tr. p. 29, 46.) Defendant argues that O'Donnell's decision to describe the Kelley array as involving a "loose" suspect "was a signal that the detectives' faith in their investigation had not revealed a 'prime' suspect," and that when O'Donnell did not similarly describe the stacked array as involving a "loose" suspect, it "implicitly signaled to Valencia" that the prime suspect was now in the stacked array. (Def. Post-Hr'g. Mem. p. 8, R. at 43.)

Defendant next argues that this "signal" was reinforced "by the different manner in which the [stacked] array was constructed." (Id.) Defendant states that the decision to use eleven photographs instead of six, and to include females in the array with males, signaled to Valencia that, even though Valencia still believed that the Assailant was a male, O'Donnell's "prime suspect" was now a female. Defendant argues that because the stacked array contained six photographs of females but only five of males, Valencia could easily eliminate the male photos from consideration because showing only five photos would be below the CPD's stated minimum number of photographs in an array. This, in Defendant's view, indicated to Valencia that O'Donnell and Simmons wanted him to pick a female suspect despite his belief that the Assailant was a male, and

12

made the stacked photo array unnecessarily suggestive.  (Id. p. 8-9.)

Officers should remain neutral when conducting identification procedures such as photo arrays, and the Supreme Court in Simmons did state that, "The chance of misidentification is . . . heightened if the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime."  Simmons, 390 U.S. at 383.  However, photo arrays generally become unnecessarily suggestive only when the officer conducting the array directs the witness to pick one *specific* photograph or otherwise indicates *which* photograph is the suspect, not when the officer merely indicates that the suspect is or may be somewhere in the array.  See, e.g., United States v. Russell, 532 F.2d 1063, 1068 (1976) (Where witness narrowed array down to two photographs and selected one, and officer "told her, in effect, that she had chosen the wrong photograph," officer's conduct was unnecessarily suggestive); United States v. Porter, 29 F.App'x. 232, 237 (6th Cir. Jan. 28, 2002) (unpublished) (When detective told witness that suspect was in array but did not suggest that witness pick a particular photo, array was not presented in an unduly suggestive manner).

Although it is arguable that O'Donnell may have indicated to Valencia that he believed that the suspect was in the stacked array by telling Valencia on the phone that he and Simmons had developed another suspect and not describing that suspect as a "loose" one (Suppression Hr'g. Tr. p. 46), when O'Donnell actually arrived at Valencia's home and began to conduct the actual identification procedure, just as he had done when presenting the Kelley array, O'Donnell read from the CPD's standard photo array procedure form, which stated that, "The subject of this investigation may or may not be included in the photographs."  (Id. Def. ex. E.)  This express and unambiguous statement outweighs any speculation as to the effect, if any, on Valencia by the use of the word

13

"loose" one time and not another time.

Defendant's arguments about the number and character of the photographs in the stacked array also do not support a conclusion that the stacked array signaled to Valencia that the primary suspect was in the stacked array. Showing eleven photographs instead of six, by itself, cannot be said to have increased the chance of misidentification, because showing a greater number of photographs generally *reduces* the risk of misidentification. See Simmons, 390 U.S. at 386 n. 6 (Upholding the use of six photographs in an array but noting that the array "in some respects [had] fallen short of the ideal," and stating that it would have been better to have shown the witness more than six photographs). Defendant's argument that using only five photographs of males directed Valencia towards the photographs of females is unpersuasive, both because 1) the second array was presented as one array comprised of eleven photographs, not two arrays comprised of six and five photographs (Suppression Hr'g. Tr. p. 48; Gov't. Resp. p. 5, R. at 44); and 2) the male and female photographs were substantially similar in appearance.

Photographs in a photo array should be substantially similar in appearance, with regard to both the appearance of the individuals depicted in the photographs, United States v. Scott, 518 F.2d 261, 265 (6th Cir. 1975), and the appearance of the photographs themselves, Tyler, 714 F.2d at 668. Slight differences between the individuals and the photographs will not render an array unnecessarily suggestive. Id. Despite the fact that the photo array in this case depicted both male and female individuals, the appearances of the individuals in the photographs were substantially similar. Every photograph depicts an African-American individual with a medium build, short dark hair, and similar facial features. (Suppression Hr'g. Tr. Gov't. ex. A1-A11.) Likewise, the photographs themselves are substantially similar in their appearance: they are all black and white

14

photographs of an individual from the shoulders up against a light grey background with no distinguishing features of any kind. (Id.) Even when one knows which photographs are of males and which are of females, it is difficult to distinguish between the male and female photographs. In fact, at the suppression hearing, O'Donnell himself, the detective who had created and shown the stacked array, could not initially properly identify which photographs were of males and which were of females. (Id. p. 45-46, 57-61.) Valencia did at one point ask O'Donnell whether a particular photograph depicted a female, but O'Donnell did not confirm his suspicion or otherwise "signal" Valencia to select a female suspect. (Id. p. 49-50.) In any event, when Valencia picked Defendant's photograph, he believed that he was picking a male suspect and was "very surprised" to learn that he had identified a female as the Assailant. (Id. p. 57.) The Court cannot conclude that the stacked array impermissibly "signaled" to Valencia that the target of the investigation was in the array. Additionally, regardless of whether O'Donnell's conduct or the composition of the stacked array implied that the new female suspect was in the stacked array, there are absolutely no facts in the record that would support an inference that O'Donnell ever indicated to Valencia *which* photograph in the stacked array was of Defendant. See, e.g., Russell, 532 F.2d at 1068; Porter, 29 F.App'x. at 236.

Finally, Defendant argues that O'Donnell and Simmons acted improperly by "bolstering" Valencia's confidence in his identification by telling Valencia that the suspect he identified was a female, not a male, and telling Valencia that his phone had been recovered from Defendant's apartment. (Def. Post-Hr'g. Mem. p. 10, R. at 43.) These actions, however, all took place *after* Valencia had picked Defendant's photograph from the stacked array, and Defendant does not explain why they make an identification procedure that had already concluded unnecessarily

15

suggestive.  If Valencia had changed his identification from "fairly certain" to "positive" after being told that he had selected a female and that his phone had been recovered from her apartment, then perhaps Defendant would have a stronger argument that O'Donnell's conduct had an improper impact on the result of the identification procedure.  But that is not the case, and there are no allegations that Valencia has ever increased his confidence in his identification in response to anything that O'Donnell may have said or done.  Defendant's arguments do not show that the stacked array was unnecessarily suggestive.

In the context of the facts before the Court, see Tyler, 714 F.2d at 667-68, Defendant cannot satisfy her burden to show that the procedure used to present the stacked array was so "impermissibly suggestive as to give rise to a very substantial likelihood of . . . misidentification." Simmons, 390 U.S. at 384.  Because Defendant cannot satisfy the first prong of the Biggers test for suppressing this pretrial identification, no further hearings on this issue are necessary and the Court **DENIES** Defendant's Motion to Suppress Identification.  (R. at 19.)

### III. Motion to Suppress Physical Evidence

Defendant's second Motion asks the Court to suppress the evidence seized during the execution of the search warrant of her apartment.  (Def. Mot. Suppress Physical Evidence, R. at 26.) Defendant argues that the affidavit sworn in support of the warrant application omitted material information, and requests an evidentiary hearing to determine the warrant's validity.  (Id.)  The Government responds by arguing that the omission at issue was not material or made with reckless disregard for the truth.  The Government further responds by arguing that even if the omitted material were considered, the affidavit still set forth probable cause to support the warrant, and thus a hearing is not required.  (Gov't. Resp., R. at 32.)

16

A.       **Applicable Legal Standard**

When reviewing a search warrant to determine its validity, courts are ordinarily limited to evaluating the information actually presented to the magistrate judge who issued the warrant and contained within the four corners of the warrant application.  Whitely v. Warden, Wyoming State Penitentiary, 401 U.S. 560, 565 n. 8 (1971); United States v. Frazier, 423 F.3d 526, 531 (6th Cir. 2005).  Affidavits offered in support of and incorporated into the warrant are presumed to be valid. Franks v. Delaware, 438 U.S. 154, 171 (1978).  In limited circumstances, however, a court may hold an evidentiary hearing to determine a warrant's validity.  When a defendant makes a "substantial preliminary showing" that the affidavit contained deliberate false statements, or statements that were made "in reckless disregard for the truth," and that those statements were necessary for establishing probable cause, the Fourth Amendment requires the court to hold an evidentiary hearing.  Id. at 155-56.  If the defendant establishes such allegations by a preponderance of the evidence at the hearing, and if setting aside the false material renders the affidavit insufficient to establish probable cause, "the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit."  Id. at 156.

The Sixth Circuit has held that allegations of "material omissions are not immune from inquiry under Franks[,]" and that if the defendant can make a substantial preliminary showing that the affidavit omitted material information through a reckless disregard for the truth or by a deliberate falsehood, the court should proceed with the Franks inquiry.  United States v. Atkin, 107 F.3d 1213, 1217 (6th Cir. 1997).  The Sixth Circuit has cautioned, however, that holding a Franks hearing based on allegations of material omissions will only occur in "rare instances[,]" Mays v. City of Dayton, 134 F.3d 809, 815 (6th Cir. 1998), because "an affidavit which omits potentially exculpatory

17

information is less likely to present a question of impermissible official conduct than one which affirmatively includes false information[,]" <u>Atkin</u>, 107 F.3d at 1217.

**B.    Analysis**

The affidavit offered in support of the application for a search warrant for Defendant's apartment in this case reads as follows:

> Your affiant, Kevin R. Horan, has been employed as a Special Agent with the Federal Bureau of Investigation for twelve years. I am currently assigned to the violent crimes Squad, and investigate gang activity, criminal enterprises, narcotics, fugitives, robberies and other violent crimes, to include car-jacking.

> On 12/4/2007, at 2:15 pm, the victim, a technician for a Cable Company was sitting in his company owned van. The victim was parked in the vicinity of 3978 Karl Road, Columbus Ohio. The suspect approached the van and pointed a weapon at the victim. Suspect then demanded money and other items of value from the victim. The suspect demanded that the victim take the suspect to the victim's residence. The victim tried to escape and the suspect shot the victim in the back.

> On 12/4/2007, the Cable Company van was taken by the suspect. The van was found in the parking lot of the Clinton Middle School, 3940 Karl Road, Columbus, Ohio. The van was taken into the custody of the Columbus Police Department (CPD) and processed for evidence. A shell casing from a 22 caliber weapon was found, inside the van.

> On 12/4/2007, the suspect took from the van and/or the victim the following items: money, a wallet containing miscellaneous identification and a pre-paid credit card and other documents, a cellular phone, XM Satellite Radio Receiver, a power inverter. The cellular phone is a Sprint Trio silver in color, rectangle in shape. To date, a complete inventory of the van's contents has not been completed. It is expected that other items may have been taken from the van. The cellular phone was provided to the victim by the Cable Company.

> On 12/5/2007, at approximately 3:15 pm, the FBI Violent Crimes Task Force (Task Force) made contact with the Sprint Nextel Corporation (Sprint) regarding the missing cellular telephone. The Cable Company gave their consent to allow Sprint to communicate with the Task Force regarding the location of the stolen cellular phone. Spring was able to provide the information pertaining to locating the phone through their GPS technology, and providing information regarding incoming and outgoing calls. At 3:15 pm, Sprint notified the Task Force that the phone was turned on and had made three outgoing calls. Two of the outgoing calls were made to an

18

individual (hereinafter referred to as Confidential Witness) at 6:31 am on 12/5/2007 and 7:14 am on 12/5/2007.

On 12/6/2007, the Confidential Witness was interviewed and stated that the person who called him/her was "Tosha." The Confidential Witness was also able to provide Tosha's physical description and her place of employment. The employer has able to identify "Tosha" as Latohsa Mathis . . . . Investigation has determined that MATHIS lives at 1515 Stonegate Square, Columbus, Ohio. This is an apartment within the Stonegate Apartments. The Stonegate Apartments are located just south of where the victim was originally taken, 3978 Karl Road. The Cable Company van was located by CPD at Clinton Middle School. Clinton Middle School is just south of the Stonegate Apartments on Karl Road. MATHIS works at Emerson Network Power, 1050 Dearborn Dr., Columbus, Ohio 43229. The victim gave a physical description of the suspect which match the general physical description of MATHIS.

Starting on 12/5/2007, Sprint was able to provide the task force with the GPS coordinates of the phone. Sprint is able to provide this service upon request by the Task Force. This is commonly referred to as pinging the phone. The GPS location is accurate to varying degrees depending on atmospheric conditions and the physical location of the phone i.e. indoor vs. outdoor. Sprint notified the Task Force that the phone was located in the vicinity of the Stonegate Apartments on: 12/5/2007 at 5:40 pm; 12/6/2007 at 12:20 pm and 2/6/2007 at 2:40 pm.

Investigation determined that MATHIS works third shift at Emerson Network Power.. MATHIS was scheduled to work at 10:25 pm to 6:25 am on 12/6 into 12/7/2007. Sprint notified the Task Force that the phone was located in the vicinity of Emerson Network Power, 1050 Dearborn Dr., Columbus, Ohio 43229 at 12:08 on 12/7/2007.

On 12/6/2007, the Confidential Witness stated that MATHIS showed him/her a cellular phone, a Sprint Trio, silver in color, rectangle in shape.. MATHIS told the Confidential Witness that she recently acquired the phone.

Based on this affiant's training and expertise, your affiant knows that perpetrators of carjackings and kidnappings often maintain evidence of the crime at their homes. Therefore based on this affiant's training and experience, as well as the information cited in this affidavit, your affiant summits there is probable cause to believe that there is evidence of the above crime (see attachment A which is fully incorporated into this document) at 1515 Stonegate Square North, Columbus, Ohio 43224.

(Search Warrant Affidavit ¶¶ 1-10.)

Defendant argues that the statement, "The victim gave a physical description of the suspect

19

which match[es] the general physical description of MATHIS" (id. ¶ 6), "omits important exculpatory information and is misleading," and later states that it is a false statement.  (Def. Mot. Suppress Physical Evidence p. 6, 14; R. at 26.)  Defendant argues that this statement is false and omits material information because Valencia initially described the Assailant as an 18-22 year old male, while the Defendant is actually a 34 year old female.

> ### 1.    The Affidavit Did Not Contain a False Statement or Omit Material Information

The Court does not agree with Defendant.  Despite the differences in gender and age, Valencia's description of the Assailant's height, weight, build, facial features and hair all closely match Defendant's characteristics.  As noted, Valencia described the Assailant as approximately 5' 7" tall weighing between 140 and 150 or 160 lbs, having a thin to medium build, short dark hair, and acne scarring on the cheeks.  (Suppression Hr'g. Tr. p. 14, 20.)  Defendant is 5' 5" tall, weighing 140 lbs. with a medium build and short black hair with acne scarring on her face.  (Id. Def. ex. F.)  Even in light of the discrepancies in gender and age, Valencia's physical description of the Assailant does generally match Defendant's physical characteristics.  The statement in the search warrant was not false or misleading because Valencia's physical description did "generally" match Defendant.  Nor is there any evidence in the record that the affiant omitted the information about the discrepancies in described gender and age through a reckless disregard for the truth.  See Franks, 438 U.S. at 155-56; Atkin, 107 F.3d at 1217.  Defendant has not made a "substantial preliminary showing" that the affidavit contained a false statement or omitted material information, and the Court determines that no Franks hearing is required.

> ### 2.    The Remainder of the Affidavit is Sufficient to Establish Probable Cause

Even if the statement is omitted and the discrepancies in described gender and age are

considered, however, the Court agrees with the Government that the remainder of the affidavit was sufficient to set forth probable cause to support the search warrant, and thus again no <u>Franks</u> hearing is required.  (Gov't. Resp. p. 6-8, R. at 32.)  Whether an affidavit sets forth probable cause is evaluated under a totality of the circumstances test that requires the magistrate judge "to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." <u>Illinois v. Gates</u>, 462 U.S. 213, 238 (1983); <u>see</u> <u>also</u> <u>United States v. Keszthelyi</u>, 308 F.3d 557, 567 (6th Cir. 2002).  After the fact scrutiny of a magistrate judge's decision to issue a search warrant should not be a *de novo* review.  <u>United States v. Terry</u>, __ F.3d __, __, No. 07-3757, 2008 WL 1721518, *2 (6th Cir. Apr. 15, 2008) (<u>quoting</u> <u>United States v. Allen</u>, 211 F.3d 970, 973 (6th Cir. 2000) (en banc)).  Rather, "the duty of a reviewing court is simply to ensure that the magistrate [judge] had a 'substantial basis for . . . conclud[ing] that probable cause existed.'" <u>Gates</u>, 462 U.S. at 238-39 (<u>quoting</u> <u>Jones v. United States</u>, 362 U.S. 257, 271 (1960)).

Absent the statement that Valencia's description of the Assailant generally matches Defendant's description, the affidavit sets forth the following information.  The Task Force learned that Valencia's silver Sprint Trio cell phone had been stolen by the Assailant.  (Search Warrant Affidavit ¶ 4.)  The day after the carjacking, December 5, the Task Force contacted Sprint and requested that Sprint ping the phone to determine its location.  Three pings on the afternoon of December 5 and the afternoon of December 6 established that the phone was "in the vicinity" of the Stonegate Apartments.  (<u>Id.</u> ¶ 7.)  Defendant points out that this pinging process was accurate to varying degrees depending on variables such as the weather and the phone's location, and that the

affidavit does not discuss any of these variables to determine how accurate the GPS coordinates were in this case. Similarly, the affidavit does not clarify what "in the vicinity" means. (Def. Mot. Suppress Physical Evidence p. 11-12, R. at 26.) The Court agrees that, standing alone, this information would not support a search warrant, but in this case it was supported by other indicia of probable cause.

Sprint also told the Task Force that Valencia's phone had been used to place three outgoing calls, two of which were to a Confidential Witness. (Search Warrant Affidavit ¶ 5.) Task Force agents interviewed this individual during the afternoon of December 6, and he/she told the Task Force that he/she had been called by "Tosha," gave a physical description,[3] stated that "Tosha" had showed him or her a silver Sprint Trio that she had recently acquired, and further stated that "Tosha" worked at Emerson Network Power. (Id. ¶ 6.) The Task Force contacted Emerson Network Power, which identified "Tosha" as Defendant and told the Task Force that Defendant lived in the Stonegate Apartments and worked third shift. Furthermore, during the third shift at Emerson Network Power on December 6 into December 7, Sprint pinged Valencia's phone and it was in the vicinity of Emerson Network Power. (Id. ¶ 8.)

Defendant devotes the majority of her Motion to arguing that the Confidential Witness' statements were not reliable, because the affidavit did not contain any information to establish his or her reliability, such as his or her name; whether he or she had given reliable information previously; where he or she had met with "Tosha" and saw the silver Sprint Trio; or whether he or

---

[3] The Confidential Witness' description of "Tosha" as a female who walked, talked, and dressed like a male, while relayed to O'Donnell (Suppression Hr'g. Tr. p. 39-40), was not included in the affidavit and the Court does not consider it when determining whether the affidavit established probable cause.

she ever saw the phone at Defendant's apartment.  (Def. Mot. Suppress Physical Evidence p. 11, R. at 26.)  Defendant argues that these deficiencies undermine the Confidential Witness' reliability, and thus undermine the affidavit's validity.

Although Defendant is correct that the affidavit does not present any of this information, the Court finds that there are other "indicia of reliability" that make the information provided by the Confidential Witness reliable.  See Gates, 462 U.S. at 234 (Favoring a "balanced assessment of the relative weights of all the various indicia of reliability").  First is the fact that the individual in this case is not a "confidential informant" in the normal sense of the phrase, but rather a "confidential witness."  Defendant argues that "this choice nomenclature is a distinction without a difference" (Def. Mot. Suppress Physical Evidence p. 11, R. at 26), but the Court thinks that, in this case, there is a difference between these two terms.  The cases that Defendant cites all deal with situations in which tipsters, usually anonymous, volunteer information of ongoing criminal activity to police officers where no prior investigation was underway.  See Gates, 462 U.S. at 225 (Anonymous letter sent to police department implicating individuals in drug trafficking, police department launches investigation to pursue the tip); Allen, 211 F.3d at 971-72 (Confidential informant contacts police detective and offers information implicating an individual in drug possession, detective begins investigation based on tip); Weaver, 99 F.3d at 1374-75 (same); Leake, 998 F.2d at 1360-61 (Anonymous phone call to police detective offers information related to marijuana possession and dealing, detective begins investigation to corroborate and pursue tip).

That is not the situation in this case.  The Confidential Witness did not unilaterally contact the Task Force and volunteer information that implicated Defendant in a crime that the Task Force was not yet investigating.  Rather, the Task Force's investigation, which was already underway, led

them to the Confidential Witness who, when interviewed, provided information relevant to the Task Force's ongoing investigation. A witness contacted in the ordinary course of an investigation and who gives information in response to questioning stands in a different position than an informant who volunteers information that begins an investigation. Such witness statements are subject to less scrutiny than an anonymous tip, see United States v. Helton, 314 F.3d 812, 820 (6th Cir. 2003) ("Anonymous tips . . . demand more stringent scrutiny of their veracity, reliability, and basis of knowledge than reports from confidential informants"), and the fact that this individual was contacted in the course of an ongoing investigation is one indicator of reliability that the Court will consider in the totality of the circumstances analysis.

The Government is also correct in pointing out that the affidavit established the Confidential Witness' basis of knowledge for his or her statements. The Confidential Witness received the two calls from Valencia's phone, and was in a position to speak from personal knowledge about who had called him or her. (Gov't. Resp. p. 7, R. at 32.) The Confidential Witness heard the calls firsthand. The Confidential Witness also knew details about "Tosha," such as her physical description and her place of employment, and he or she spoke from personal knowledge when relaying this information to the Task Force.

The information the Confidential Witness provided to the Task Force about "Tosha's" employment was also corroborated by subsequent investigation. The Gates totality of the circumstances approach recognizes the value of independent police work that corroborates details provided to police, and independent police corroboration can help to establish probable cause to support a search warrant. See Gates, 462 U.S. at 240-45; United States v. Williams, 224 F.3d 530, 533 (6th Cir. 2000). The Task Force confirmed that "Tosha" did indeed work at Emerson Network

24

Power, as the Confidential Witness had stated, by contacting Emerson Network Power and learning that "Tosha" was Defendant.  This discovery, in turn, corroborated the investigation's earlier findings, such as the fact that Valencia' phone pinged in the vicinity of the Stonegate Apartments, because the Task Force learned that Defendant lived in the Stonegate Apartments.  When Valencia's phone then pinged in the vicinity of Emerson Network Power when Defendant was working there during the third shift, the connection between Defendant, the phone, Emerson Network Power, and the Stonegate Apartments was established and the Confidential Witness' statements were substantially confirmed.

Evaluated together and under the totality of the circumstances, this information was sufficient to allow the magistrate judge to conclude that "there [was] a fair probability that contraband or evidence of a crime [would] be found" in Defendant's apartment in the Stonegate Apartment complex, and thus to conclude that probable cause existed to search Defendant's apartment.  See Gates, 462 U.S. at 238.  Because the information in the affidavit is sufficient to establish probable cause without considering the statement that Valencia's description of the Assailant substantially matched Defendant, Defendant is not entitled to a Franks hearing.  The Court concludes that the magistrate judge was correct in determining that the affidavit set forth probable cause to search Defendant's apartment, and thus the search was valid.  Defendant's Motion to Suppress Physical Evidence (R. at 26) is **DENIED**.

### 3.      Leon's Good Faith Exception Would Allow the Evidence to be Admitted

Because the Court concludes that there was probable cause to support the search warrant, it is not necessary to address Defendant's argument that Leon's good faith exception does not apply. (Def. Mot. Suppress Physical Evidence p. 13-16, R. at 26.)  Even if the Court had concluded that

the affidavit did not set forth probable cause to support the search warrant, however, the good faith exception would have applied and the evidence would still be admissible.

In <u>United States v. Leon</u>, 468 U.S. 897 (1984), the Supreme Court first articulated the "good faith" exception to the exclusionary rule.  When the police obtain evidence "in objectively reasonable reliance on a subsequently invalidated search warrant," <u>id.</u> at 922, the deterrence rationale of the exclusionary rule is not implicated and the evidence will be admitted.  However, the Supreme Court did note that circumstances exist that would make reliance on the invalidated warrant clearly unreasonable.  Defendant argues that two of those circumstances exist in this case: 1) when "the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth," <u>id.</u> at 923; and 2) when the warrant is "based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable,'" <u>id.</u> (quoting <u>Brown v. Illinois</u>, 422 U.S. 590, 610-11 (1975)).

The Court does not agree.  As explained above, the affidavit in this case did not contain information that the affiant "knew was false or would have known was false except for his reckless disregard for the truth," <u>id.</u>, because the statement that Valencia's description generally matched Defendant was not false and did not contain a material omission.  Similarly, the affidavit is not a "bare bones" affidavit that lacked sufficient indicia of probable cause that would make relying on it unreasonable.  The affidavit in this case described the Task Force's investigation and the results, and detailed the information obtained through the phone records, the Confidential Witness' statements, the results of pinging Valencia's phone, and other information that would permit an objectively reasonable officer to rely on the affidavit.  (Search Warrant Affidavit ¶¶ 1-10.)  Even if

the Court had found that the affidavit did not establish probable cause, the information in the affidavit was sufficient to allow a reasonable officer to rely on it, and <u>Leon</u> would apply.

**IV.    Conclusion**

For the reasons stated above, Defendant's Motion to Suppress Identification (R. at 19) and Motion to Suppress Physical Evidence (R. at 26) are **DENIED**.

**IT IS SO ORDERED.**

Date: May 2, 2008                                         <u>**/s/ John D. Holschuh**</u>
                                                          John D. Holschuh, Judge
                                                          United States District Court